**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Walter Norton**</u>

       **v.**                                 Case No. 06-cv-490-PB
                                              Opinion No. 2009 DNH 081

<u>**Cross Border Initiative
Task Force, et al.**</u>

<u>**MEMORANDUM AND ORDER**</u>

    Walter Norton claims that he was punched, kicked, stomped on, and handcuffed too tightly during the course of his arrest on January 23, 2004.  He has sued United States Drug Enforcement Administration ("DEA") Agent Michael O'Shaughnessy, Massachusetts State Trooper Mark Blanchard, Haverhill, Massachusetts Police Officer Brian Proulx, and Lawrence, Massachusetts Police Officer Mark Rivet.  The defendants have filed motions for summary judgment challenging Norton's claim that the defendants violated his Fourth Amendment right to be free from the use of excessive force during the course of his arrest.  For the reasons set forth below, I grant the defendants' motions for summary judgment.

## I.   BACKGROUND

### A.   FACTUAL BACKGROUND

Norton's claims stem from his arrest on drug distribution charges on January 23, 2004 by the DEA's Cross-Border Initiative ("CBI") Task Force.  The CBI Task Force is a joint law enforcement group of local, state, and federal enforcement officials that investigates the interstate drug trade.  Numerous law enforcement officers, including the defendants, were involved in the CBI Task Force operation to arrest Norton and his cohort, Greg Lemire.  O'Shaughnessy was the lead agent in the operation that led to Norton's arrest.  Proulx was a deputized CBI Task Force Officer.

In January 2004, under the direction of O'Shaughnessy, the CBI Task Force was conducting an ongoing investigation into Norton and Lemire's alleged drug trafficking activities. O'Shaughnessy arranged to arrest Norton and Lemire after they made a controlled sale of cocaine to an undercover officer.  At approximately 11:00 a.m. on January 23, 2004, prior to executing the controlled sale, O'Shaughnessy held a briefing with members of the CBI Task Force and informed the group that Norton had a criminal history that included convictions for assault and battery as well as assault and battery with a dangerous weapon.

-2-

O'Shaughnessy also advised the group that everyone present might be required to participate in the arrests.  O'Shaughnessy assigned certain agents, including Proulx, to conduct surveillance of Norton and Lemire, and assigned others to go directly to the Pheasant Lane Mall ("the Mall") in Nashua, New Hampshire, where the controlled sale and arrest were expected to occur later that day.

O'Shaughnessy then traveled to the Nashua Police Station and met with members of the Nashua Police Department, including its Strategic Response Team ("SRT"), and the Massachusetts State Police, including Blanchard, to explain the operation and the expectations for the day.  O'Shaughnessy advised the group of Norton's prior criminal record, assigned the SRT to assist in the arrests of Norton and Lemire, and explained that he expected that the SRT would have the primary role in taking Norton and Lemire into custody.  Following this briefing, O'Shaughnessy went to the parking lot of the Nashua Police Station and instructed the confidential source to call Norton and set up the drug sale at the Mall for later that day.  After completing these meetings, O'Shaughnessy went to the Mall and parked in the food court parking lot, where the controlled sale was expected to occur.  He

-3-

set up video and audio equipment to record the sale, and monitored the audio recording from his vehicle.

As assigned, Proulx conducted surveillance of Norton's house in Lowell, Massachusetts.  He then followed Norton to the Mall in Nashua.  Once at the Mall, Proulx parked in the Sears parking lot overlooking the food court parking lot where the controlled sale was slated to occur.  Blanchard, who was already in the Mall parking lot, was driving a small truck and dressed in plain clothes -- jeans and a sweatshirt. Blanchard's primary assignment was to monitor the movements of the undercover officer and cooperating witness at the Mall in an effort to assure their safety during the controlled sale.

Once at the Mall, Norton and Lemire sold a quantity of cocaine to an undercover law enforcement agent in exchange for cash in the food court parking lot.  When the sale was complete, Norton and Lemire attempted to leave the parking lot in their cars.  At that time, O'Shaughnessy, who had been monitoring the sale from his car, gave the radio signal to arrest.  Upon hearing this signal, the CBI Task Force went into action.  Norton, who was in his car, with Lemire following directly behind in his own car, turned to leave the parking lot and was stopped when Blanchard pulled his truck nose to nose

-4-

with Norton's vehicle so that Norton could not proceed without
striking Blanchard's truck.  Terry Hanson, a CBI Task Force
Officer who was driving a truck containing SRT members,
positioned the truck behind Norton's car, Lemire's car, and a
car driven by Special Agent Robert Kew.  These actions
prevented Norton and Lemire from being able to escape in their
vehicles.

At the same time, other officers affiliated with the CBI
Task Force converged on the scene to assist in the arrests of
Norton and Lemire.  SRT members deployed from the back of the
truck driven by Hanson and ran toward the cars.  Several
officers immediately descended on Lemire's car and had to break
the driver's side window to remove Lemire from the car and
arrest him.  Proulx asserts that he drove from the Sears
parking lot toward the food court parking lot, stopped at the
access road connecting the lots, left his vehicle, and ran
toward the scene heading toward Lemire's vehicle.  Lemire was
already under arrest so Proulx went to Norton's car.

By this time, Blanchard had alighted from his vehicle,
proceeded to the door of Norton's vehicle, and ordered Norton
out of his car and onto the ground.  Norton complied by getting
out of his car and laying face down on the ground next to his

car in a prone position parallel to his car with his feet
toward the front of his car and his head toward the rear.  His
arms and hands were either in front of him or at his sides.
Norton complied with all of the commands of the officers at the
scene and did not resist in any way.  Norton alleges, however,
that he was physically assaulted by several members of the CBI
Task Force.

       According to Norton, while he was on the ground, a car
pulled up parallel to Blanchard's truck and to the right of
him.  The driver of the car emerged, ran to where Norton was
lying, and punched him in the face.  Norton Dep. at 21-25.  The
man who hit him in the face allegedly did so "a couple times."
Id. at 26.  During his deposition, Norton described the man who
hit him as six feet to six-four, 260 to 270 pounds, wearing
winter clothes including jeans and either a sweatshirt or a
heavy-duty flannel shirt.  Id. at 24.  Norton also noted that
this man was the same man who later took him off of the ground
to a standing position.  Norton further alleges that while he
was being punched a different individual kicked him in the face
and ribs from his left side, but Norton testified that he could
not see or identify the person who kicked him.  Id. at 26.[1]

_____

       [1] Norton is clear in his deposition that two different
individuals were involved in the physical assault -- one who

Norton claims that he was kicked three or four times -- two or three kicks to the face and one kick to the ribs.  Id. at 30. The punching and kicking of Norton occurred simultaneously; Norton describes the punches and kicks from the two individuals as occurring "at the same time."  Norton Dep. at 26.  During the assault, Norton asked the officers to stop and might have brought his hands, which were still unrestrained, to his face to block the punches and kicks that were being inflicted on him.  Id. at 28-30.

According to Norton, after the individual to his left kicked him several times, that same person placed the hood on Norton's sweatshirt over his head, "stomped" his head into the ground, and told him to keep the hood on.  Id. at 31.  Norton clarifies that having his head "stomped" to the ground means that while his face was already on the ground, the individual "stepped on [the back of his] head and hit it to the ground." Id. at 32.  Norton testified that the hood, once placed on his head, obstructed his vision.  Norton's hands were not restrained while he was being punched and kicked.  A short time

punched him and another who kicked and stomped on him.  Norton Dep. at 26-31.  In his Motion for Leave to File a First Amended Complaint, however, Norton appears to assert that one individual, Mark Rivet, is responsible for punching, kicking, and stomping on him.  (Doc. No. 158.)

after this alleged assault, while Norton was still on the ground, he was told to put his hands behind his back and was placed in zip-tie handcuffs by one of the individuals who assaulted him to restrain his hands from free movement.  Norton notes that "right away" the zip tie handcuffs that were placed on him were "way too tight."  Id. at 40.  Norton also describes his handcuffing as being "pretty simultaneous" with having his head "stomped" to the ground.  Id. at 33.  Norton was on the ground for approximately two to three minutes total.[2]  Id. at 36.

The defendants all assert that they neither participated in, witnessed, nor were aware of any assault on Norton. Further, all of defendants assert that they neither were responsible for the use of the zip-tie handcuffs on Norton nor aware of which officer applied the zip-ties to Norton.

Rivet asserts that he drove to the scene in a tan, unmarked Chevrolet Impala as Norton was being stopped, exited his vehicle, and assisted officers who had converged on the scene.  Rivet further asserts that Norton was lying on the ground when he approached and that he stood near Norton for

_____

[2] In his interrogatory responses, Norton estimates that he spent approximately two to four minutes "lying on the ground."  (Doc. No. 111-4.)

several minutes before Norton was brought to his feet.  Proulx asserts that when he reached Norton's car, Norton was already arrested and on the ground, covered by two members of the SRT. While Norton was on the ground, Proulx searched his car.  After the completion of the search of Norton's car, Proulx asserts that Norton was picked up from the ground and held by Rivet. Norton's pants kept falling down because of a broken button, and Proulx helped Norton pick them up.  Proulx also engaged in brief conversation with Norton.

By this point, O'Shaughnessy had left his vehicle and had run toward the scene of the arrest, where there were already approximately twenty law enforcement officers and both suspects were already under arrest.  O'Shaughnessy approached Norton to inform him that his arrest was part of a federal investigation. Norton asserts that he had two exchanges with O'Shaughnessy at the scene of his arrest and informed O'Shaughnessy that the zip ties were too tight both during both exchanges.  In addition, Norton asserts that he told numerous other officers, including Proulx and Rivet, that the zip ties were too tight and requested that they be loosened, but none of the officers complied with Norton's requests.  Norton stood in the zip ties with his hood over his head for two or three minutes.  Id. at

-9-

39.  All of his requests regarding the zip ties occurred within five minutes of his initial arrest.  Id. at 45.

O'Shaughnessy instructed a Nashua police officer to escort Norton to the waiting cruiser for transport to the Nashua Police Station.  While in the cruiser waiting for transport, Norton complained to the transporting officer about the zip ties.  The transporting officer did not comply with Norton's request to loosen or remove the zip ties.  After a few minutes, Norton was transported to the Nashua Police Station, and within one or two minutes of arriving at the station, a Nashua police officer removed the zip ties.  Norton states that his hands were purple when the zip ties were removed.  During intake, Norton told a nurse about numbness in his hands and was given either Motrin or Tylenol in pill form, but received no other medical attention.  Norton's booking photo shows redness on his right temple consistent with an abrasion, as well as some redness and possible swelling on his left cheek.  The booking photo does not show any other signs of injury consistent with a beating.

Video surveillance from the Mall shows portions of the arrest scene on January 23, 2004.  The initial moments of the arrest are not captured on this video, and the video does not

focus on Norton.  Further, not all of the parties in the video have been identified for the court.  The video shows a partial view of Norton after he is already lying on the ground and restrained.  Later, the video shows Norton wearing a hood after he has been helped to his feet.  Rivet, who was wearing a light sleeveless vest over a light or white shirt, and tan or beige slacks with cordovans, can also be seen in the video standing immediately to the left of and over Norton when he is on the ground and later holding Norton after he has been brought to his feet.  Numerous law enforcement officers, including Blanchard and Proulx can be seen in the vicinity of Norton and Rivet.  Although Norton asserts otherwise, the surveillance video does not show the alleged assault.

Norton is currently serving a sentence at United States Penitentiary-Canaan for conspiracy to distribute cocaine. Since his arrest, Norton has suffered from severe migraine headaches that are at times paralyzing and cause loss of vision.  He claims that his headaches have caused him to be sick and have at times made it difficult for him to eat and sleep.  Norton states that has sought medical treatment "numerous times" for his headaches at each of the correctional facilities that he has been transferred to and has been

prescribed Excedrin Migraine, Elavil, and Propranolol, in addition to being given Tylenol and Motrin.  Also since his arrest, Norton has suffered from pain and daily numbness in his hands.  Norton sought medical treatment during the first ten months of his incarceration for the problems with his hands. He testified that his hands were x-rayed, and that medical told him there was nothing wrong with his hands, they could do nothing for him, and that "it might be nerve damage."  Norton Dep. at 53.  Norton testified that he has not received any other medical attention for his hands since that time.  He provides no medical records as evidence and he has not offered any expert testimony to support his claims.

**B.   PROCEDURAL BACKGROUND**

On December 21, 2006, Norton filed a *pro se* complaint alleging that numerous state and federal law enforcement officers violated his civil rights by using excessive force during his arrest on January 23, 2004.  Specifically, Norton alleges that he was the target of punches and kicks to his face, as well as the stomping of his head into the concrete and several blows to his body.  In addition, Norton alleges that excessive force was used when officers applied plastic zip ties on his wrists in lieu of metal handcuffs.  He asserts that the

-12-

zip tie handcuffs were too tight on his wrists, caused him severe pain, and cut off his circulation, resulting in continuing numbness in his hands to this day.  Norton's complaint lists twenty defendants, but does not specify what actions each defendant took that violated Norton's constitutional rights.

On June 6, 2007, the court ordered Norton to amend his complaint to identify, with specificity, what conduct on the part of each individually named defendant rendered each defendant liable to suit.  After engaging in discovery, Norton voluntarily dismissed all of the defendants except for Rivet, Blanchard, Proulx, and O'Shaughnessy.[3]  The remaining defendants

---

[3]  The court ordered Norton to amend his complaint by June 26, 2007 and later granted a number of motions to extend time to file the amended complaint. (Doc. No. 6.) The amended pleadings were due by October 15, 2007, but Norton asked for another extension on the deadline to file his amended complaint.  On October 17, 2007, the court issued an order noting that Norton had not filed his amended complaint, but finding that Norton had alleged the minimum facts to state a claim and that he could move to amend his complaint with specificity at a later time. (Doc. No. 13.)  Subsequent to the filing of the defendants' motions for summary judgment, on April 30, 2009 Norton filed a Motion for Leave to File a First Amended Complaint, arguing that he was unable to his amend his complaint at an earlier time because of the defendants' alleged lies and stalling in the discovery process.  (Doc. No. 158.) Because this Memorandum and Order addresses all of the claims in Norton's proposed First Amended Complaint, I intend to deny Norton's Motion for Leave to File a First Amended Complaint as futile in a separate order.

now file motions for summary judgment, to which Norton objects.

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The evidence submitted in support of the motion for summary judgment must be considered in the light most favorable to the nonmoving party, indulging all reasonable inferences in its favor.  See Torres-Negron v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007).

A party seeking summary judgment must first identify the absence of any genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.  The opposing party "may not rely merely on allegations or denials in

its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

### III.   ANALYSIS

Norton's filings are not a model of clarity or consistency, but because he is proceeding *pro se* I have endeavored to construe his claims broadly.

### A.   LAW

A claim that law enforcement officers used excessive force in the course of effectuating an arrest is properly analyzed under the Fourth Amendment's "reasonableness" standard. See Scott v. Harris, 550 U.S. 372, 381 (2007) (citing Graham v. Connor, 490 U.S. 386, 388 (1989)).  To hold an officer liable under this standard, the plaintiff must prove that the officer: (1) actively participated in the use of excessive force; (2) violated a duty to protect the victim from the use of excessive force by other officers; or (3) failed to properly supervise subordinates who used excessive force.  Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997).  Norton bases his claims on all three theories of liability.

1.   Use of Excessive Force

-15-

It's axiomatic that "a police officer may use only such force as is reasonably necessary to effect an arrest or defend himself or others from bodily harm." United States v. McQueeney, 674 F.2d 109, 113 (1st Cir. 1982). To succeed on a claim of use of excessive force, a plaintiff must establish that the defendants' actions in making the arrest were objectively unreasonable in light of the facts and circumstances known to the arresting officer on the scene at the time of the arrest. Calvi v. Knox County, 470 F.3d 422, 428 (1st Cir. 2006). To make a determination of whether an officer's use of force was reasonable, the court should look to such criteria as the severity of the alleged offense, whether or not the arrestee posed an immediate threat to the safety of others, and whether or not the arrestee was actively resisting arrest or attempting to flee. See Graham, 490 U.S. at 396; Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009); Bastien v. Goddard, 279 F.3d 10, 14 (1st Cir. 2002).

2.   Failure to Protect

A police officer who fails to prevent the use of excessive force by another officer in his presence may be held liable for a Fourth Amendment excessive force claim under certain circumstances. See Calvi, 470 F.3d at 428 n.3; Gaudreault v.

-16-

Mun'y of Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990).  Mere presence at the scene, however, is not sufficient to render an officer legally responsible for a fellow officer's actions. Calvi, 470 F.3d at 428.  "Absent evidence of participation, concerted action, or at least culpable knowledge, one officer cannot be held jointly liable under section 1983 for another officer's use of excessive force."  Id. at 429.

To hold an officer liable for a failure to protect against the use of excessive force, the officer must have been present when excessive force was used; observed the use of excessive force and reasonably understood that the victim's constitutional rights were being violated; had a "realistic opportunity" to prevent that use of force; had sufficient time to do so; and failed to take reasonable steps to intervene.  See Martinez v. Colon, 54 F.3d 980, 985 (1st Cir. 1995) (citing Gaudreault, 923 F.2d at 207).  Thus, an officer who merely observes another officer's sudden, momentary use of excessive force cannot be held liable for an excessive force claim because he would not have a realistic opportunity to intervene.  See Gaudreault, 923 F.2d at 207 n.3; O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988)("The three blows were struck in such rapid succession that [the defendant officer] had no realistic opportunity to attempt

-17-

to prevent them.  This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator.")

    3.  <u>Supervisory Liability</u>

The doctrine of respondeat superior does not apply to constitutional claims.  <u>See</u> <u>Ruiz Rivera v. Riley</u>, 209 F.3d 24, 28 (1st Cir. 2000)(<u>Bivens</u> claims); <u>Gaudreault</u>, 923 F.2d at 209 (section 1983 claims).  A supervisor "may be found liable only on the basis of her own acts or omissions." <u>Figueroa v. Aponte-Roque</u>, 864 F.2d 947, 953 (1st Cir. 1989).  Thus, a supervisory officer can be held liable for the behavior of his subordinate officer only where his "action or inaction [is] affirmative[ly] link[ed] . . . to that behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence amounting to deliberate indifference.'" <u>Lipsett v. Univ. of Puerto Rico</u>, 864 F.2d 881, 902 (1st Cir. 1988)(internal citation omitted).

> The requirement of an 'affirmative link' between the behavior of a subordinate and the action or inaction of his supervisor 'contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.'  Deliberate indifference, moreover, 'will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights.'

Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)(quoting Hegarty

v. Somerset County, 53 F.3d 1367, 1380 (1st Cir. 1995)).   If,

however, the supervisee has inflicted no constitutional harm, the

supervisor cannot be held liable.   City of Los Angeles v. Heller,

475 U.S. 796, 799 (1986).

**B.   <u>APPLICATION</u>**

    1.   <u>Assault</u>

Norton asserts that Rivet was the person who punched him and

that Proulx was the person who kicked him and stomped on his

head.[4]   He argues that all of the defendants are liable for

failing to prevent the assault and he also seeks to hold

O'Shaughnessy liable on a supervisory liability theory.   I

address each argument in turn.

    **a.   Rivet - Assault**

Norton seeks to hold Rivet liable for participating in the

alleged excessive use of force against him while he was lying on

the ground prior to being restrained.   Rivet acknowledges that he

---

[4]   In his deposition, Norton asserts that "it must have
been" Rivet who punched him and that another individual, who
"could have been" Proulx, kicked him and stomped on his head.
In his Motion for Leave to File a First Amended Complaint,
however, Norton appears to change course and assert that Rivet is
solely responsible for punching, kicking, and stomping on him.
(Doc. No. 158.)   I address all of Norton's claims below.

was in the vicinity when Norton was lying on the ground and later when Norton was standing, but Rivet asserts that he neither engaged in the assault against Norton nor saw any officer punching, kicking, or otherwise assaulting Norton.  Rivet's Resp. to Interrogatories at 3-4.  For the following reasons, I conclude that Rivet is entitled to summary judgment on Norton's excessive force claim.

Norton's conclusory and inconsistent assertions are the only evidence to support the claim that Rivet used excessive force on him.  Norton's initial claim was that "it must have been" Rivet who punched him.  Norton Dep. at 125.  However, Norton merely assumes that Rivet took part in the alleged use of excessive force, and offers only a conclusory allegation of Rivet's role. By saying that "it must have been" Rivet who punched him, Norton has essentially conceded a lack of personal knowledge as to the identity of the puncher.  Further, in his deposition, Norton is unable to physically describe or identify Rivet.  Norton Dep. at 124-25.  To the extent that Norton describes the individual who allegedly punched him, that description is inconsistent with Rivet's appearance on the day of Norton's arrest.  See Norton Dep. at 126-27; Rivet Interrogatory Responses 20-21.  While Norton describes the individual who punched him as wearing jeans

and a heavy-duty flannel shirt or sweatshirt, Rivet was wearing a
light colored sleeveless vest over a light colored shirt and tan
or beige slacks on the day of Norton's arrest.  Norton's
inconsistent description of Rivet and the puncher draw Norton's
assertions that Rivet "must have been" the puncher into question.

    While Norton says that his basis for believing that it "must
have been" Rivet who punched him is Proulx's sworn testimony that
Rivet was the person who lifted Norton from the ground, Norton
Dep. at 125, Norton fails to explain how he knows that the person
who lifted him from the ground is the person who punched him.
Norton's personal knowledge as to this matter cannot be taken for
granted, considering that, by his own account, his vision was
obscured by the hood that had been placed over his head by the
time he was lifted to his feet.  Norton's statements do not set
forth any facts that might establish personal knowledge that the
person who punched him was the person who picked him up off the
ground.  The personal knowledge requirement prevents a witness
from testifying to what he "could not have actually perceived or
observed."  United States v. Rodriquez, 162 F.3d 135, 144 (1st
Cir. 1998).  "[R]ank speculation" cannot defeat a properly
supported motion for summary judgment.  Rathbun v. Autozone,
Inc., 361 F.3d 62, 66 (1st Cir. 2004).  In sum, because Norton's

statement that Rivet "must have been" the puncher is an assumption and does not demonstrate the requisite personal knowledge, it cannot create a genuine issue of material fact precluding summary judgment.

After accusing Rivet of being the individual who punched him and asserting that a different individual kicked him, Norton later changes course and also seeks to hold Rivet liable as the individual who kicked and stomped on him.  These inconsistent accounts of the assault further highlight that Norton's assertions regarding Rivet are mere speculation, lacking any foundation in personal knowledge.  Norton admits in his deposition that he doesn't know who the kicker was and that it is "impossible" for him to identify the kicker.  But Norton seeks to hold Rivet liable as the kicker because of the Mall surveillance video, which Norton claims "clearly shows Mark Rivet kick the plaintiff."  Despite Norton's assertions, however, the surveillance video does not substantiate his claims.  While review of the surveillance video reveals that Rivet was standing immediately to Norton's left while Norton was lying on the ground, the video does not show Norton being punched, kicked or stomped on, and does not show the initial moments of the arrest when the alleged assault purportedly occurred.

In sum, there is an absence of evidence that Rivet participated in the application of excessive force during Norton's arrest by punching, kicking, or stomping on him.  The only evidence to support the claims against Rivet are Norton's conclusory statements, but Norton gives conflicting accounts of who is responsible for the assault, his description of the puncher is not consistent with Rivet's appearance on the day of the arrest, and Norton admits that he cannot identify the kicker. Moreover, the Mall surveillance video does not substantiate Norton's claims because it does not show any assault on Norton and only shows the portion of the arrest after any alleged assault occurred.  The absence of evidence that a particular individual took any action against a claimant that constituted excessive force is fatal to a civil rights claim against that particular individual.  See Davis v. Rennie, 264 F.3d 86, 108-09 (1st Cir. 2001)(involving insufficient evidence to support a finding that workers at a mental health facility used excessive force to reasonably restrain a patient).  Accordingly, because there is not sufficient evidence that Rivet used any force on Norton, Rivet is entitled to summary judgment on Norton's claim that he applied excessive force.

### b.   Proulx - Assault

Norton seeks to hold Proulx liable for use of excessive force in kicking him while he was prone on the ground.  More specifically, Norton testified that he named Proulx as a defendant because he "could have been" the individual that kicked him.[5]  I conclude that Norton's claim against Proulx fails.

Proulx's sworn testimony is that he was not a participant in the alleged excessive force used against Norton and that by the time he arrived at the arrest scene, Norton was already under arrest and being covered by other officers.  Proulx Resp. to Interrogatories at 2; Proulx Dec. at 2.  Norton provides no evidence to contest Proulx's testimony.  In fact, in his deposition, Norton admits that he doesn't know who the kicker was, that it is "impossible" for him to identify the kicker, and that it is "speculation" that Proulx could have been the kicker.

---

[5] In his deposition, Norton states that he has named Proulx as a defendant because Proulx "was right there" and "could have been the officer who was kicking me."  Norton Dep. at 29, 44. Later, in his Motion for Leave to File a First Amended Complaint, Norton appears to abandon his claim that Proulx was involved in the alleged assault and instead appears to assert that Rivet was the sole individual who assaulted him while Proulx and Blanchard failed to intervene to stop the assault.  Because I have not granted Norton leave to file his first amended complaint, I note Norton's inconsistent claims and address his original claim against Proulx.

Norton Dep. at 34, 39.  Norton testified that he had no
information that Proulx was the individual who kicked him, but
that he had named Proulx as a defendant because Proulx "could
have been" the officer who kicked him.  Norton Dep. at 29, 44.
While Norton asserts that he doesn't "know if [Proulx is] telling
the truth or if he's lying," Norton Dep. at 44, a "plaintiff may
not defeat summary judgment by merely asserting that the jury
might, and legally could, disbelieve the defendant's denial."
LaFrenier v. Kinirey, 550 F.3d 166, 167 (1st Cir. 2008).  "[R]ank
speculation" cannot defeat a properly supported motion for
summary judgment.  Rathbun, 361 F.3d at 66.

        There is nothing inherently unbelievable about or
inconsistent in Proulx's testimony of what he did or saw at the
scene of Norton's arrest.  Norton has not offered any
contradictory evidence and has only provided speculation about
Proulx's involvement in the alleged use of force against Norton.
Because Norton has provided no evidence to support his claim and
because summary judgment cannot be denied on the basis that the
officer's accounts of the events were not believable, Proulx is
entitled to summary judgment on Norton's claim that he applied
excessive force.

### c.   All Defendants - Failure to Protect

Norton seeks to hold the defendants liable for failure to protect him from the use of excessive force by other officers. Norton's claim appears to rest upon the defendants' presence at the scene of the arrest and Norton's speculation that the officers "could have at the very least witnessed everything." Id. at 84.  I conclude that Norton's claims against the defendants for failure to protect against the use of excessive force cannot be maintained because to the extent that any excessive force was used against Norton by any officers, there is no evidence that the defendants witnessed it or were in a position to prevent it.

The sworn testimony of all of the defendants is that they did not observe any person strike, punch, kick or otherwise assault Norton at any time, and they were unaware that Norton was in any distress related to a physical assault.  Norton offers no affirmative evidence to dispute the sworn testimony of the defendants.  While the Mall surveillance video shows officers, including some of the defendants, near Norton when he is lying on the ground and later when he is standing, the video does not support Norton's assertion that any of the defendants were present during, or aware of, an assault against Norton because

-26-

the video only shows the latter portion of Norton's arrest and, despite Norton's assertion to the contrary, it does not show any assault.  Furthermore, although the defendants were on the scene of Norton's arrest at some point in time, establishing a defendant officer's mere presence at the scene, without more, is not enough to hold that officer liable for failure to intervene and protect against the use of excessive force.  Calvi, 470 F.3d at 428.

Even assuming that the defendants were on the scene at the time of Norton's alleged assault, there is no evidence that any of the defendants had a realistic opportunity to intervene in the alleged physical assault because, as Norton has described the assault, it was sudden, the punching and kicking occurred simultaneously, and it lasted only a few moments.  Further, Norton's booking photo, which shows only a minor abrasion on the side of his face, and his medical treatment, which does not indicate that he required extensive treatment, are consistent with a brief encounter rather than a prolonged and extensive beating. The quick and simultaneous nature of the force allegedly inflicted on Norton suggests that, even if the defendants did see other officers punching and kicking Norton, there was insufficient time and an unrealistic opportunity to intercede.

See Davis, 264 F.3d at 98 n.10 (noting that in Gaudreault the First Circuit found no liability for failing to intervene where an attack "was over in a matter of seconds," because the defendant officers "did not have a realistic opportunity to intercede").  Finally, there is no evidence of any concerted action or joint participation on the part of any of the defendants.

In sum, Norton fails to show that any of the defendants knew that Norton was being subjected to an assault or that the defendants had a realistic opportunity to prevent the alleged harm.  Because Norton's claim of failure to protect against the use of excessive force is based on pure speculation and he has adduced no evidence to contradict the defendants' testimony that they were unaware of any use of excessive force, I conclude that the defendants are entitled to summary judgment on this claim.  See Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856 (1st Cir. 2008)(determining that a grant of summary judgment may be predicated exclusively on the uncontradicted testimony of the defendant, even though he is an interested party).

### d.   O'Shaughnessy - Supervisory Liability

Norton seeks to hold O'Shaughnessy liable for the use of excessive force against him based on O'Shaughnessy's lead-agent

status.  More specifically, Norton seeks to hold O'Shaughnessy liable as a supervisor of the other CBI Task Force officers. Norton asserts that O'Shaughnessy is liable as a supervisor for failing to properly oversee the training, conduct, and disciplining of the officers who were on the scene.  I conclude, however, that summary judgment in O'Shaughnessy's favor is appropriate because the record fails to suggest, much less establish, that the actions or inactions of O'Shaughnessy were affirmatively linked to or "led inexorably to the constitutional violation" alleged.  Pineda, 533 F.3d at 54.  Assuming arguendo subordinate liability on the part of any members of the CBI Task Force, the record contains no probative evidence establishing any affirmative link, sufficient to support a finding of culpability, between the actions of which Norton complains and O'Shaughnessy. Norton has not adduced any evidence that O'Shaughnessy's conduct amounted to supervisory encouragement, condonation or acquiescence in the alleged use of excessive force.  Nor has Norton adduced any evidence that O'Shaughnessy's action or inaction was gross negligence amounting to deliberate indifference.

Evidence of the use of excessive force against Norton, standing alone, does not support an inference that O'Shaughnessy

condoned, encouraged, or acquiesced in the use of such force.
See Voutour v. Vitale, 761 F.2d 812, 820 (1st Cir. 1985).  Prior
to Norton's arrest, O'Shaughnessy held briefings with the
operation participants to explain the arrest plan, and he has
provided a sworn declaration that at no time did he suggest,
condone, or encourage any officers to use more than the minimal
necessary force to bring Norton into custody.  O'Shaughnessy Dec.
at 2 ¶ 3.  Further, O'Shaughnessy had no information to suggest
that any of the officers expected to take part in the arrest
either had a history of using excessive force or intended to use
excessive force against the suspects.  Id. at 2 ¶ 4; cf.
Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562-63 (1st Cir.
1989) (affirming finding of supervisory liability where
supervisor knew that subordinate had a reputation for violently
mistreating citizens).  Finally, the undisputed evidence reveals
that O'Shaughnessy was not present when the alleged excessive
force was used against Norton.  According to Norton's own sworn
account, O'Shaughnessy only approached him and was in his
vicinity for mere moments after he had already been arrested and
brought to a standing position.  Norton Dep. at 34-35.

In sum, Norton has produced no evidence from which a jury
could determine that the officers who allegedly used excessive

force during Norton's arrest acted in response to anything
O'Shaughnessy did or did not do.  There is no evidence that
O'Shaughnessy failed to adequately train, supervise, investigate,
or discipline the alleged offending officers.  O'Shaughnessy is
entitled to summary judgment because there is no evidence that he
did anything to encourage, condone, or acquiesce in the actions
of the officers who allegedly engaged in excessive force; nor
should it have been manifest to O'Shaughnessy that his actions or
inactions were likely to violate Norton's right to be free from
excessive force.  See Pineda, 533 F.3d at 54 (affirming grant of
summary judgment in favor of supervisory officers where the
officers were not present at the arrest, and there was no
evidence that the officers encouraged, acquiesced or condoned the
use of excessive force).

>    **2.  Use of Zip Ties**

A review of Norton's filings suggests that he seeks to hold
the defendants liable for using excessive force when applying his
zip tie handcuffs and failing to loosen or remove the allegedly
too-tight zip tie handcuffs.  Norton does not dispute that
officers are entitled to restrain those who are arrested in most
circumstances.  See Atwater v. City of Lago Vista, 532 U.S. 318,
354-55 (noting that a normal lawful custodial arrest where one is

handcuffed, placed in a patrol car, and taken to the police station is not violative of the Fourth Amendment).  Rather, Norton's claim is that the zip ties used to restrain him were applied too tightly and that officers on the scene ignored his complaints that the zip ties were too tight.  See Calvi, 470 F.3d at 428 n.3 (the duty of an officer to protect an individual from excessive force by a fellow officer may include the obligation to loosen or remove inappropriately applied handcuffs).  I conclude, however, that there is insufficient evidence in the record from which a fact-finder could conclude that any of the defendants applied the zip tie handcuffs to Norton or otherwise violated Norton's constitutional rights by not removing the zip-tie handcuffs within five minutes of his arrest.

Considering the reasonableness of the defendants' actions from the perspective of an officer on the scene, Norton has not established that the use of zip tie handcuffs was objectively unreasonable under the circumstances.  See Graham, 490 U.S. at 397; Calvi, 470 F.3d at 428.  Although Norton did not resist arrest, the police at the scene of Norton's arrest encountered a hazardous situation and could have been reasonably concerned for their safety.  Drug dealing is known to be a violent crime, there was more than one suspect on the scene, and the CBI Task Force

officers were aware that Norton had a history of violence,
including assault and battery with a dangerous weapon.  Thus, it
was reasonable for officers on the scene to ensure that Norton's
hands were securely restrained.  More importantly, the zip ties
were applied in a customary fashion and were kept on Norton for
no more than the time reasonably necessary to transport him to
the Nashua Police Station.  Calvi, 470 F.3d at 428.

Although Norton complained to numerous officers that the zip
ties were too tight and that his wrists were hurting and going
numb, the summary judgment record presents too little evidence of
any actual injury to find that any excessive force was applied to
Norton when he was handcuffed.  See Cortez v. McCauley, 478 F.3d
1108, 1129 (10th Cir. 2007)(holding that an arrestee's complaints
to officers of too-tight handcuffs coupled with an affidavit that
the handcuffs left marks that were visible for days after the
arrest constituted insufficient evidence to support an excessive
force claim if the use of the handcuffs where the use of the
handcuffs was otherwise justified); Glenn v. City of Tyler, 242
F.3d 307, 314 (5th Cir. 2001) (noting that "handcuffing too
tightly, without more, does not amount to excessive force");
Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir.
1990)(determining that arrestee's allegations of pain as a result

of being handcuffed, without some evidence of more permanent
injury, are insufficient to support a claim of excessive force).
Handcuffs are not meant to be comfortable and it is not uncommon
for an arrestee to complain of discomfort from hand restraints.
The subjective complaints of an arrestee over the course of fewer
than five minutes, without more, do not give rise to a conclusion
that officers on the scene were objectively unreasonable in
refusing to loosen or remove handcuffs.

At best, the evidence that excessive force was used in
cuffing Norton consists of Norton's complaints to officers on the
scene, his requests for medical treatment, and his current
complaints of numbness in his hands.  He does not offer any
objective medical evidence to support his subjective complaints.
Without any such medical evidence of injury and because the
evidence we do have demonstrates that the zip tie cuffs were not
left on Norton any longer than reasonably necessary to effect his
arrest and ensure officer safety, Norton's unsubstantiated claims
are not sufficient to support a finding that excessive force was
used in the application of the zip tie handcuffs.  It follows
that the defendants, who Norton claims should have intervened to
loosen or remove the zip ties to Norton's wrists, are not liable
for failure to intervene.

Finally, without a finding that an officer has used excessive force in handcuffing Norton and inflicted constitutional harm, O'Shaughnessy cannot be held liable as a supervisor.  See City of Los Angeles, 475 U.S. at 799.  Thus, O'Shaughnessy is not liable as a supervisor for the alleged use of excessive force in handcuffing Norton or the failure to loosen Norton's zip tie handcuffs by CBI Task Force officers.

## IV.  CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment (Doc. Nos. 111, 114, 115) are granted.  The clerk shall issue judgment for the defendant.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

June 12, 2009

cc:  Walter Norton, pro se
     T. David Plourde, Esq.
     Seth Aframe, Esq.
     Joseph G. Donnellan, Esq.
     Peter Phillips, Esq.
     Roger Phillips, Esq.
     Matthew Dwyer, Esq.
     Ryan Dunn, Esq.